UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GUADALUPE MARTINEZ-RODRIGUEZ,

Plaintiff,

v.

UNITED STATES OF AMERICA,

Defendant.

CASE NO. C08-0265JLR

FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter came for trial on September 20-21, 2011, before the court sitting without a jury. Plaintiff Guadalupe Martinez-Rodriguez was represented by Glenn Kenneth Carpenter, Jr. Defendant United States of America was represented by Harold Malkin and Kerry Jane Keefe of the United States Attorney's Office in Seattle, Washington. The court has considered the testimony presented at trial, the exhibits admitted into evidence, and the arguments of counsel. The court has weighed the testimony, exhibits, and evidence using the required "preponderance of the evidence"

standard. Now the court, being fully advised, makes its findings of fact and conclusions of law as follows.

## I. FINDINGS OF FACT

1. The parties stipulated to the following facts prior to trial (*see* Proposed Pretrial Order (Dkt. # 67)):

a. Mr. Martinez-Rodriguez was a resident of Washington State at all times relevant to the lawsuit.

b. Defendant United States of America, was the employer of former Defendant Kevin Wetteland, an agent with the United States Drug Enforcement Administration ("DEA") at all times material hereto.

c. At all times relevant to this matter, Special Agent Wetteland was acting within the scope of his employment with the United States of America.

d. On August 22, 2005, Mr. Martinez-Rodriguez was arrested by DEA agents, including Agent Wetteland, in the parking lot of Cafe Arizona in Federal Way, Washington.

e. During the arrest, two of Mr. Martinez-Rodriguez's fingers on his right hand were broken and he sustained abrasions to the right side of his face and right shoulder.

f. At the time of the arrest, Mr. Martinez-Rodriguez was wearing a white sleeveless t-shirt, knee-length shorts, and sandals.

g. As the result of the injury to Mr. Martinez-Rodriguez's fingers on August 22, 2005, the range of motion of those fingers continues to be limited.

h. Mr. Martinez-Rodriguez's injury to his fingers will result in a total economic loss of $28,211.00 over the remainder of his working life.

i. DEA does not instruct DEA agent trainees, and did not instruct Agent Wetteland, in the use of a finger hold.

j. DEA training in arrest techniques emphasizes tactics that employ "gross" rather than "fine" motor skills.

k. DEA's investigation of Mr. Martinez-Rodriguez was assigned to DEA Special Agent Steven Taibi and was triggered by information Agent Taibi received from a Confidential Source ("C/S") on August 22, 2005.

l. At the time of his arrest and just prior to being taken to the ground by Agent Wetteland, Mr. Martinez-Rodriguez participated in the delivery of one pound of methamphetamine to a DEA C/S.

m. During the period April 17, 2008 to June 1, 2011, medical records indicate that Mr. Martinez-Rodriguez was treated by medical personnel on three occasions (February 2, 2010, February 10, 2010 and June 1, 2011) for complaints of pain or other complications associated with the middle and ring fingers of Mr. Martinez-Rodriguez's right hand, which were broken during Mr. Martinez-Rodriguez's arrest on August 22, 2005.

2. The parties also stipulated to the Physical Capacity Report of Fay J. Tripp, M.S. (*See* Proposed Pretrial Order at 13; Pl.'s Ex. 7.)

3. The court makes the following findings regarding credibility and the weight it has given to the testimony of certain witnesses.

a. Mr. Martinez-Rodriguez testified on his own behalf. Although the court finds Mr. Martinez-Rodriguez credible regarding the extent of his injuries and the pain that he continues to suffer as a result, the court finds the testimony of Mr. Martinez-Rodriguez to be less credible than the testimony of the DEA Special Agents regarding the events of August 22, 2005. The court's determination that Mr. Martinez-Rodriguez's testimony is less credible is based on Mr. Martinez-Rodriguez's testimony on cross-examination during his rebuttal case that Special Agent John Satchell did not ask him questions while Agent Satchell processed him at the DEA following his arrest and before transporting him to the Pierce County Jail. The evidence was uncontroverted that Agent Satchell processed Mr. Martinez-Rodriguez for booking; the court does not find it credible that Agent Satchell asked Mr. Martinez-Rodriguez no questions during this process.

b. Each party presented a medical expert to testify as to his or her opinions regarding the mechanism by which Mr. Martinez-Rodriguez's fingers were broken. Mr. Martinez-Rodriguez called Dr. Randall Patten, a diagnostic radiologist. The United States called Dr. Sarah Beshlian, a board-certified orthopedic surgeon specializing in injuries to the hand and upper extremities. Although the court finds both experts to be credible, the court placed more weight on the opinions offered by Dr. Beshlian because Dr. Beshlian has more relevant experience diagnosing and treating injuries to the bones of the hands and fingers than Dr. Patten.

4. DEA's investigation of Mr. Martinez-Rodriguez was assigned to Agent Taibi and triggered by information he received from a C/S on the morning of August 22, 2005. The C/S related that he had had several prior conversations with Mr. Martinez-Rodriguez during which Mr. Martinez-Rodriguez indicated a willingness to supply the C/S with methamphetamine.

5. Prior to attempting to arrange a delivery of methamphetamine by Mr. Martinez-Rodriguez to the C/S, Agent Taibi enlisted the assistance of other DEA agents in the investigation, including Agent Wetteland, and provided them with an Operational Briefing during which they were apprised of the plan to stage a "buy-bust" operation involving methamphetamine.

6. Following the Operational Briefing, Agent Wetteland's involvement with Agent Taibi's investigation of Mr. Martinez-Rodriguez commenced with surveillance of Mr. Martinez-Rodriguez as he met with the C/S outside Freddie's Casino in Fife, Washington, at approximately 5:30 p.m. on August 22, 2005. The purpose of the meeting was for Mr. Martinez-Rodriguez to deliver a one-ounce sample of methamphetamine to the C/S.

7. At the conclusion of the meeting between Mr. Martinez-Rodriguez and the C/S at Freddie's Casino, the C/S provided Agent Taibi with what Mr. Martinez-Rodriguez represented was the one-ounce sample of methamphetamine. Following Mr. Martinez-Rodriguez's departure, Agent Taibi field-tested the substance, confirmed that the substance tested positive for methamphetamine, and broadcast confirmation via radio

of the one-ounce delivery to the other agents involved in the investigation, including Agent Wetteland.

8. As Mr. Martinez-Rodriguez's car departed Freddie's Casino, Agent Wetteland followed the car in which Mr. Martinez-Rodriguez was traveling to an apartment complex in Kent, Washington.

9. Agent Wetteland and another DEA Task Force agent separately surveilled the Kent apartment complex until Mr. Martinez-Rodriguez and a second individual left the complex, at which time Agent Wetteland followed Mr. Martinez-Rodriguez's car to Cafe Arizona in Federal Way, Washington.

10. During a phone conversation the C/S had with Mr. Martinez-Rodriguez at Agent Taibi's direction minutes before Mr. Martinez-Rodriguez left the Kent apartment complex, Mr. Martinez-Rodriguez agreed to deliver a pound of methamphetamine to the C/S at Cafe Arizona in Federal Way, Washington. Agents involved in the investigation, including Agent Wetteland, were advised of this fact by radio.

11. Distribution of methamphetamine is a serious offense.

12. Mr. Martinez-Rodriguez selected Cafe Arizona as the location for his second meeting with the C/S.

13. Mr. Martinez-Rodriguez arrived at Cafe Arizona at approximately 6:30 p.m. in the passenger seat of a green Plymouth Breeze, followed shortly thereafter by the C/S, who parked his car some distance from Mr. Martinez-Rodriguez. After about five minutes, Mr. Martinez-Rodriguez's car re-positioned itself across from the C/S's car.

14. After arriving in the vicinity of Cafe Arizona, Agent Wetteland, who was wearing a vest with the word "POLICE" visible across the front, located himself some distance to the east of where Mr. Martinez-Rodriguez and the C/S were parked.

15. A surveillance video shot by Agent Jewell outside Cafe Arizona shows Mr. Martinez-Rodriguez getting out of the car and walking towards the C/S's car wearing knee-length shorts and a white tank top.

16. The DEA video also captures the individual who arrived at Cafe Arizona with Mr. Martinez-Rodriguez getting out of the car at the same time as Mr. Martinez-Rodriguez and retrieving a package from the trunk. This second individual deposited the package in the back seat of the Breeze. Moments later, the video shows Mr. Martinez-Rodriguez getting into the back seat of Mr. Martinez-Rodriguez's car, the C/S opening the door and looking into the back seat of the car, and then the C/S leaving the car and giving a pre-arranged "bust" signal to nearby undercover DEA agents.

17. Upon seeing the C/S give the pre-arranged "bust" signal, which signaled that the C/S had seen the methamphetamine in Mr. Martinez-Rodriguez's car, agents converged on Mr. Martinez-Rodriguez and the driver of the Plymouth Breeze.

18. Agent Wetteland reasonably presumed that Mr. Martinez-Rodriguez, who had just delivered one pound of methamphetamine to DEA's C/S, could be armed and dangerous.

19. As Agent Taibi approached Mr. Martinez-Rodriguez at rifle point, Agent Taibi shouted at him to "Raise your hands; get on the ground!" At the same time, Special Agent Errin Jewell, who was located on the other side of Mr. Martinez-Rodriguez,

shouted "Manos arriba!"—"Hands up!" in Spanish. Agent Jewell stopped shouting when he realized that Agent Taibi's shouts were louder.

20. Mr. Martinez-Rodriguez did not "get on the ground," as he was instructed to do, but instead raised his hands to his head, looked from side to side and then, without being instructed to do so, began to lower his hands.

21. From his vantage point, Agent Wetteland reasonably interpreted Mr. Martinez-Rodriguez's failure to follow agent commands, his head movements, and the lowering of his hands as an indication that Mr. Martinez-Rodriguez was contemplating flight or about to flee.

22. Agent Wetteland reasonably believed that the risk posed by Mr. Martinez-Rodriguez's imminent flight from the crime scene could endanger the safety of DEA agents attempting to subdue him and/or members of the general public in the vicinity of the Cafe Arizona.

23. In the few seconds Agent Wetteland had to react to Mr. Martinez-Rodriguez's actions, Agent Wetteland elected to attempt to subdue Mr. Martinez-Rodriguez by taking Mr. Martinez-Rodriguez to the ground.

24. Agent Wetteland took Mr. Martinez-Rodriguez to the ground by running towards Mr. Martinez-Rodriguez, who was standing at a slight angle, and by extending his forearm into Mr. Martinez-Rodriguez's upper torso, which caused Mr. Martinez-Rodriguez to fall backwards and to the right.

25. After being struck and knocked to the right by Agent Wetteland, Mr. Martinez-Rodriguez fell to the ground landing on his right hand, which resulted in him breaking his middle and ring fingers.

26. The events that transpired between when Mr. Martinez-Rodriguez was confronted by officers and Agent Wetteland's decision to take Mr. Martinez-Rodriguez to the ground took place within less than 10 seconds.

27. Agent Wetteland did not attempt to subdue Mr. Martinez-Rodriguez by grabbing his fingers and twisting them until they broke.

28. DEA does not instruct DEA agent trainees, and did not instruct Agent Wetteland, in the use of a finger hold. Rather, DEA's training in arrest techniques emphasizes tactics that employ "gross" rather than "fine" motor skills.

29. The testimony of DEA Special Agent Nikos Eliopoulos established that the manner in which Agent Wetteland took Mr. Martinez-Rodriguez to the ground following his failure to comply with lawful commands was consistent with the training Agent Wetteland received in arresting non-compliant suspects. Agent Wetteland attempted (1) to gain control of the situation by going "hands on"; (2) to disrupt Mr. Martinez-Rodriguez's balance; and (3) to take Mr. Martinez-Rodriguez to the ground so that he could be handcuffed.

30. Although the agents were aware that Mr. Martinez-Rodriguez spoke Spanish, at no time prior to Mr. Martinez-Rodriguez's arrest did Agent Wetteland or other agents involved in Mr. Martinez-Rodriguez's arrest have information that Mr. Martinez-Rodriguez did not understand English.

31. Following Mr. Martinez-Rodriguez's arrest, Agents Taibi, Jewell and Satchell observed Mr. Martinez-Rodriguez display an understanding of English.

32. X-rays taken of Mr. Martinez-Rodriguez's broken fingers on August 22, 2005, at St. Francis Hospital, do not reveal a spiral fracture pattern, which would be present were Mr. Martinez-Rodriguez's injuries purely rotational in nature.

33. The testimony of Dr. Beshlian, a Board-certified orthopedic surgeon with "Added Qualifications in Hand Surgery," established that it was more likely than not that Mr. Martinez-Rodriguez's fingers were broken when he fell to the ground and landed in whole or in part on his right hand, and not as the result of Agent Wetteland twisting Mr. Martinez-Rodriguez's fingers.

34. Testimony at trial established that given the totality of the circumstances with which he found himself confronted and of which he had knowledge on August 22, 2005, Agent Wetteland's actions when subduing Mr. Martinez-Rodriguez were objectively reasonable.

## II. CONCLUSIONS OF LAW

1. Under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 *et seq.*, "The United States shall be liable . . . relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674.

2. Liability and, if appropriate, damages under the FTCA are determined in accordance with the law of the place where the act or omission that is the subject of an FTCA action took place. 28 U.S.C. § 1346(b)(1); *see, e.g., Klein v. United States*, 537

F.3d 1027, 1030 (9th Cir. 2008). In this action, the relevant acts took place in Washington and, therefore, Washington law applies.

3. Any damages Mr. Martinez-Rodriguez may be awarded cannot exceed $350,000, the amount set forth in the administrative tort claim that Mr. Martinez-Rodriguez presented to DEA on June 18, 2007. 28 U.S.C. § 2675(b)

4. Washington law defines the tort of assault as the use or threatened immediate use of force that causes reasonable apprehension of harm. *Brower v. Ackerley*, 943 P.2d 1141, 1144-45 (Wash. Ct. App. 1997).

5. Battery is defined under Washington law as an intentional tort, requiring the tortfeasor to intend a harmful touching and requiring the plaintiff to show that there was no consent to the touching. *Garratt v. Dailey*, 279 P.2d 1091, 1093 (Wash. 1955).

6. Under Washington law, force used by a police officer is not unlawful "[w]henever necessarily used . . . in the performance of a legal duty." *See Brooks v. City of Seattle*, 599 F.3d 1018, 1031 (9th Cir. 2010) (citing RCW 9A.16.020(1)).

7. When assessing the liability of federal law enforcement officers for torts committed in the course of making an arrest, Washington law employs the "objective reasonableness" standard of the Fourth Amendment. *See Garcia v. United States*, No. C06-0041JCC, slip op. at 14-15 (W.D. Wash. August 7, 2008) ("objective reasonableness" test applies under Washington law to assault claim against federal agent brought under FTCA) (citations omitted) (citing *Seaman v. Karr*, 59 P.3d 701, 709 (Wash. Ct. App. 2002)*; McKinney v. City of Tukwila*, 13 P.3d 631, 641 (Wash. Ct. App. 2000)).

8. Where the use of force is reasonable, a police officer in Washington State is entitled to state-law qualified immunity for assault and battery. *Brooks v. City of Seattle*, 599 F.3d 1018, 1031 (9th Cir. 2010) (citing *McKinney*, 13 P.3d at 641).

9. The reasonableness of a particular use of force should be evaluated from the perspective of a reasonable officer on the scene, not 20/20 hindsight, because police officers are often forced to make split-second judgments in tense, uncertain and rapidly evolving circumstances. *Seaman*, 59 P.3d at 709 (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)); *see Garcia*, No. C06-0041JCC, slip op. at 15 (applying Washington law).

10. Agent Wetteland's actions in response to (1) Mr. Martinez-Rodriguez's delivery of one pound of methamphetamine to DEA's C/S in a busy public area; (2) Mr. Martinez-Rodriguez's non-compliance in response to the agents' lawful commands; and (3) Mr. Martinez-Rodriguez's looking from side to side and lowering of his hands were objectively reasonable. Therefore, Agent Wetteland is entitled to immunity under Washington law for Mr. Martinez-Rodriguez's assault and battery claims. *See McKinney*, 13 P.3d at 641. Further, because Agent Wetteland's use of force was reasonable, the assault and battery claims fail because the touching was lawful. *See id.*

## III. CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the court directs the clerk to enter judgment in favor of Defendant United States of America.

//

//

Dated this 22nd day of September, 2011.

JAMES L. ROBART
United States District Judge